ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

KENNETH NEWCOMBE and
TRIDIP GOSWAMI,

Defendants.

**SEALED INDICTMENT**

24 Cr.

24 CRIM 5671

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

The Grand Jury charges:

Overview

1.    From at least in or about 2021 through 2023, KENNETH NEWCOMBE and
TRIDIP GOSWAMI, the defendants, agreed to and did perpetrate a scheme to commit fraud in the
multi-billion-dollar global market for buying and selling carbon credits, which resulted in their
company, CQC Impact Investors LLC ("CQC"), fraudulently obtaining carbon credits worth tens
of millions of dollars.

2.    CQC was a for-profit company that ran projects to generate carbon credits—
including a type of credit known as a voluntary carbon unit ("VCU")—by reducing emissions of
greenhouse gases.  One VCU was designed to represent a reduction or removal of emissions equal
to one metric ton of carbon dioxide equivalents.  CQC profited by selling VCUs it obtained, often
to companies seeking to offset the impact of greenhouse gases they emit in the course of operating
their businesses.

3.    One type of project that CQC ran to obtain VCUs involved installing cookstoves in
rural Africa and Southeast Asia, among other places (collectively, the "Cookstove Projects").  The

cookstoves, if installed and used properly, were more efficient than the preexisting cooking methods many people in those regions used. To obtain VCUs from its Cookstove Projects, CQC collected data about, among other things, (1) how much fuel people saved by using CQC's cookstoves, as opposed to the preexisting cooking methods, and (2) the number of CQC's stoves that were installed and operational. That data went into a formula that an issuer of VCUs ("Issuer-1") used to calculate the emission reductions CQC had achieved and to determine how many VCUs to issue to CQC.

4.    From at least in or about 2021, through 2023, KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, along with others at CQC, submitted false and misleading data to Issuer-1, tricking Issuer-1 into giving CQC VCUs for emission reductions that, according to Issuer-1's methodology for calculating such reductions, had not in fact been achieved. The primary ways in which the co-conspirators deceived Issuer-1 were by fraudulently altering data to show that CQC's cookstoves achieved increased fuel savings and by manipulating the data-collection process to make it appear that more of CQC's stoves were operational than was actually the case. Because of this fraud, CQC received millions more VCUs than it otherwise would have, which were worth tens of millions of dollars at then-prevailing prices for VCUs. CQC sold VCUs it had fraudulently obtained to unsuspecting purchasers, who thought they were purchasing VCUs that reflected emission reductions calculated in accordance with Issuer-1's methodology.

5.    Relying on data about those fraudulently obtained VCUs, KENNETH NEWCOMBE, the defendant, and others at CQC also deceived an investor ("Investor-1") into agreeing to invest up to $250 million in CQC. The agreement included Investor-1 purchasing some of NEWCOMBE's shares in CQC for more than $16 million.

Background on Carbon Credits

6.     The market for carbon credits emerged from an effort to reduce greenhouse gas emissions.  Most carbon credits are created through, and trade in, compliance markets.  In a compliance market, a government or a group of governments sets a limit on the amount of greenhouse gases companies can emit, then issue carbon credits to reflect those emission allowances, with each credit typically representing one metric ton of carbon dioxide equivalents. The governments running the market can also issue carbon credits to entities that create projects to reduce or remove greenhouse gas emissions, which are sometimes referred to as "offset" credits. Issuing these carbon credits creates a market: If a company plans to emit more greenhouse gases than the credits it was allotted, it can go into the market and purchase more credits, either from companies that do not plan to use their full allotment or from companies that have obtained offset credits.  This buying and selling has the effect of creating a market price for greenhouse gas emissions.

7.     Not all countries have compliance markets.  This has led to the growth of a voluntary carbon market.  Unlike in compliance markets, the voluntary carbon market does not involve a regulatory cap on emissions, with credits reflecting allowances.  Instead, voluntary markets revolve around companies and entities that voluntarily set goals to reduce or offset their carbon emissions, often to align with goals from employees or shareholders.  One way companies meet these voluntary goals is by purchasing offset credits.  These are similar to offset credits in compliance markets: Entities obtain credits by running projects that reduce emissions or remove greenhouse gases from the atmosphere, and companies looking to meet voluntary emission targets purchase those credits.  An important difference, however, is that in voluntary markets the credits are issued by non-governmental organizations, using standards for measuring emission reductions

that they develop based on input from market participants, rather than on mandates from governments. The value of a credit in the voluntary market, then, depends not on whether a government will accept it, but instead on how market participants view the quality and integrity of the process used to issue the credit.

### Issuer-1 and VCUs

8.     At all times relevant to this Indictment, Issuer-1 was the world's largest issuer of voluntary carbon credits, accounting for nearly half of the global issuances of voluntary carbon credits. Many of the credits Issuer-1 issued were called "Voluntary Carbon Units" or "VCUs."

9.     Before an entity could receive VCUs from Issuer-1, the entity had to develop a project. The first step in that process entailed submitting a project proposal to Issuer-1, which Issuer-1 published on its website. Issuer-1 then worked with a third-party auditor—known as a validation and verification body or "VVB"—which examined the reasonableness of the proposal's assumptions and methods. Once the VVB determined the project was reasonable, the project developer submitted a registration request to Issuer-1, which contained details about the projects and the VVB's report.

10.     If Issuer-1 accepted the project, the project developer could begin applying for VCUs. The details of that application process differed depending on the type of project. In sum Issuer-1 had an approved formula—called a methodology—for calculating the emission reductions a project had achieved. The project developer had to gather data on the project's performance and input it into the formula to calculate emission reductions. The project developer submitted that data, and the results of the calculation, to Issuer-1, which sent it to a VVB for auditing. If the VVB signed off on the data, Issuer-1 would issue VCUs based on the extent of the emission reductions. Issuer-1 relied on the truthfulness and accuracy of information submitted by project developers

and required developers, when submitting data to claim VCUs, to certify that their filings were "true and accurate in all material respects and do not contain any false, fraudulent, or misleading statements or information."

11.     Each of Issuer-1's VCUs had a unique serial number. Issuer-1 sent the VCUs to the project developer's account on Issuer-1's website. Issuer-1 also displayed on a public registry information about VCUs it had issued, which included data the project developer submitted to obtain those credits. Parties could then buy and sell the VCUs, which involved moving them between accounts on Issuer-1's website.

Issuer-1's Cookstove Methodology

12.     Between 2021 and 2023, the primary way CQC obtained VCUs was through its Cookstove Projects registered with Issuer-1. KENNETH NEWCOMBE, the defendant, was on the Board of Directors of Issuer-1 and, in or about 2020, he proposed that Issuer-1 adopt a new methodology for calculating emission reductions from cookstove-related projects (the "Cookstove Methodology"). NEWCOMBE was in favor of the Cookstove Methodology because he believed it would allow CQC to generate more VCUs than existing methodologies.

13.     The Cookstove Methodology was designed to assess the extent to which a cookstove-installation project reduced emissions over a particular time, with Issuer-1 issuing VCUs based on the result. The Cookstove Methodology involved a number of different inputs, but the amount of VCUs a project developer would obtain depended largely on two variables: (1) the amount of fuel people used on the new cookstoves (known as "ByNew"), which the Cookstove Methodology used to calculate the amount of fuel saved per stove; and (2) the percentage of stoves installed during the project that were still operational (known as the "P"

5

value), which the Cookstove Methodology used to determine the number of stoves for which the project developer could claim emission reductions.

14.    Issuer-1 required project developers to conduct surveys to calculate these two, critical variables. To calculate ByNew, the project developer had to identify a random sample of households that had received cookstoves through the project. The project developer would visit those homes and ask the stove recipients to make a bundle of wood equal to the amount they burned in the new stove on a typical day. The developer would then weigh the wood and record the results. This sample produced the ByNew value, which was supposed to reflect the amount of wood burned per day in each new stove.

15.    Under the Cookstove Methodology, that ByNew value was used to determine the amount of emission reductions from each stove in the project, using predetermined data about stove efficiency. For example, suppose the survey results showed that households used 5 kg of wood on the new stoves each day. The Cookstove Methodology would use an assumption about the efficiency of the new stoves compared to old cooking methods to estimate how much wood the stove recipient would have needed for the same amount of cooking, using the old methods. If that calculation resulted in, say, 7.5 kgs for the same amount of cooking using the old methods, this meant that, according to the Cookstove Methodology, the project saved 2.5 kg of wood per stove, per day. A separate calculation translated those fuel savings into emission reductions, so the end result of this calculation was the average amount of emissions saved per day for each installed stove.

16.    Notably, under the Cookstove Methodology, a higher ByNew value translated to higher emission reductions and more VCUs. This meant that a project developer the Cookstove Methodology would receive more VCUs if its surveys resulted in higher ByNew values.

6

17.     The Cookstove Methodology called for another survey to calculate the P value, which was supposed to reflect the percentage of installed stoves that were operational. For that survey, the project developer again identified a random sample of households that had received new stoves, then visited the homes to determine whether the stoves were still operational and in use. That survey resulted in a percentage of operational stoves. The Cookstove Methodology required that percentage to be applied to the total number of installed stoves, to determine the number of stoves for which the project developer could claim VCUs. For instance, if the project developer had installed 100,000 stoves and the survey generated a P value of 85%, the project developer could claim VCUs for only 85,000, instead of the full 100,000.

18.     Together, the ByNew and P values dictated the amount of VCUs the project developer would receive. The ByNew value—in combination with other fixed variables— determined the amount of emissions reduced per stove, per day. The P value determined the number of stoves for which the project developer could claim emission reductions. So together, the variables produced the total emissions reduced per day, across the entire project.

19.     Under the Cookstove Methodology, the project developer could choose when to conduct surveys and apply for VCUs for the period since the prior survey. Each survey period was called a monitoring period or "MP"—the first monitoring period was MP1, the second MP2, and so on. A cookstove project typically lasted approximately 10 years, so the project developer for such a project could apply for credits multiple times, generating a regular stream of credits. While the P value was calculated anew during each monitoring period, the ByNew value was calculated only during MP1, and that ByNew value from MP1 was used in every subsequent monitoring period. As a result, the ByNew value from MP1 was particularly important, as it would affect every subsequent VCU issuance.

The Explosive Growth of CQC's Cookstove Projects

20.     KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, and others at CQC—including CQC's Chief Operating Officer, Jason Steele—carried out a multi-year scheme to fraudulently obtain VCUs from Issuer-1 by submitting false and misleading data about its Cookstove Projects to Issuer-1 and then selling the resulting fraudulently obtained VCUs to unsuspecting buyers and investors.

21.     KENNETH NEWCOMBE, the defendant, founded CQC in or about 2008 and, at all times relevant to this Indictment, was the company's Chief Executive Officer.

22.     TRIDIP GOSWAMI, the defendant, was the Head of CQC's Carbon & Sustainability Accounting Team ("CSAT") from at least 2020, up to and including early 2023. CSAT was responsible for designing the surveys CQC used to claim VCUs, calculating emission reductions using the Cookstove Methodology, and communicating with Issuer-1 and VVBs about survey results.

23.     Before 2020, CQC ran Cookstove Projects in a handful of countries across Sub-Saharan Africa and parts of Asia.  Those projects were small, compared to what would come in subsequent years.  For example, some of its larger projects—implemented between 2018 and 2020—involved installing approximately 200,000 stoves per year.

24.     Beginning in or around 2020, KENNETH NEWCOMBE, the defendant, set a new direction for CQC and decided to rapidly and aggressively increase the size of CQC's Cookstove Projects.  Around that time, NEWCOMBE had begun raising money for CQC's projects through special purpose vehicles ("SPVs").  The SPVs were designed to be a partnership between CQC and an outside investor, whereby the investor would provide funds for stove installation, CQC would manage the installation process, and the parties would share revenue from the resulting

8

VCU sales. In connection with those new SPV projects, NEWCOMBE committed CQC to installing approximately 1 million stoves a year between 2021 and 2023. This was a substantial increase over CQC's historic installation numbers.

25.    CQC sold, and planned to sell, VCUs from its Cookstove Projects to other companies, including its SPV partners. Some of those companies committed in advance to long-term contracts, promising to buy VCUs at set prices, guaranteeing CQC a steady stream of revenue if it could generate the VCUs it expected. Some of the agreements CQC entered into with those companies contained representations and warranties, in which CQC represented that the information contained in materials it sent to Issuer-1 would be "true and accurate in all material respects."

26.    CQC's rapid growth caused significant problems for the quality of its Cookstove Projects. To meet the targets set by KENNETH NEWCOMBE, the defendant, CQC had to rely on partners that did poor work installing stoves; installed stoves in locations that were outside of a project's scope (*e.g.*, installing stoves in a suburban area, instead of a rural area, because it was easier to meet targets in more populated areas); and sometime claimed to install stoves that they never installed. Even when CQC's partners installed stoves properly, the scale of CQC's growth made it difficult for the company to check on installed stoves and teach stove recipients how to use the new devices. Employees of CQC communicated those problems to NEWCOMBE and other members of leadership, often in weekly calls about operational issues.

27.    CQC's logistical issues posed a meaningful problem for the number of VCUs that the company's projects might generate. If stoves were not installed properly, or at all, it was likely that surveys would show low levels of stoves in operation (the P value), which could reduce the number of stoves for which CQC could claim VCUs. Similarly, if stove recipients did not use the

stoves regularly—either because the stoves were of poor quality or because the recipients were not accustomed to using them—the ByNew surveys were likely to show that people were using the stove inconsistently, further reducing VCUs from the projects.

### The Fraudulent Scheme to Obtain VCUs

28.     CQC began MP1—the first monitoring period—for some of its new Cookstove Projects in 2021.  The results of those surveys quickly began to show that, for many projects, CQC was going to generate significantly fewer VCUs than it had anticipated.

29.     Rather than properly following the Cookstove Methodology, KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, and others at CQC—including Jason Steele, the Chief Operating Officer—conspired to fraudulently inflate the number of VCUs CQC would receive from Issuer-1 by sending Issuer-1 false and misleading information about the success of its projects.  As explained further below, this fraud primarily consisted of manipulating ByNew survey results and fraudulently inflating the number of stoves for which CQC claimed VCUs by manipulating P value surveys and not writing off stoves the co-conspirators knew were missing or broken.

### ByNew Data Manipulation

30.     KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, Jason Steele, and others inflated the number of VCUs CQC would obtain by manipulating ByNew survey data. By fraudulently increasing the ByNew value during MP1—the first monitoring period of a project—the co-conspirators ensured CQC would be able to claim an inflated amount of emission reductions per stove throughout the entire life of the project because, in each subsequent monitoring period, the Cookstove Methodology allowed them to reuse that number.

31.     For example, KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants,

Jason Steele, and others manipulated ByNew data associated with projects in Malawi and Zambia that CQC was operating as part of its SPVs:

a.    In or about August 2021, CQC received ByNew survey data for two projects in Malawi and two in Zambia (the "Malawi Projects" and the "Zambia Projects," respectively). Data arrived for the Malawi Projects first. TRIDIP GOSWAMI, the defendant, wrote to KENNETH NEWCOMBE, the defendant, and Jason Steele that he had reviewed the data and "there are issues." He reported the ByNew value for one of the Malawi Projects was approximately "2.35 kg per stove per day" and "2.47 kg per stove per day" in the other. Those numbers, GOSWAMI explained, would result in the Malawi Projects receiving only about half of the VCUs CQC had anticipated.

b.    NEWCOMBE responded by writing that "[t]his is a disaster for us" and explaining that CQC "needed 5kg [per stove per day] to make the basic economics of the deal work." NEWCOMBE, GOSWAMI, and Steele exchanged emails about possible solutions, and GOSWAMI ultimately informed them that the "[o]nly option left" was "to 'revise' the survey results." NEWCOMBE responded by asking about MP1 survey results from other countries, and GOSWAMI informed him that the ByNew values for the Zambia Projects were 3.34 kg per stove per day in one project and 2.67 kg per stove per day in the other—far below the 5 kg NEWCOMBE had said were necessary.

c.    NEWCOMBE, GOSWAMI, and Steele agreed to manipulate the ByNew values for the Malawi and Zambia Projects and enlist a person from outside CQC ("CC-2") to fill out fraudulent survey forms to reflect the manipulated numbers.

d.    GOSWAMI worked out an arrangement, whereby CQC would pay CC-2 per survey that CC-2 filled out. NEWCOMBE signed off on the terms of CC-2's payment.

NEWCOMBE, GOSWAMI, and CC-2 then exchanged emails about the new, manipulated ByNew values to use for the Malawi and Zambia Projects. Steele eventually proposed ByNew survey values of 3.66 kg and 3.65 kg for the Malawi Projects and 3.35 kg and 3.31 kg for the Zambia Projects, all of which were higher than the actual survey results. NEWCOMBE said those numbers were "great" and directed GOSWAMI and Steele to "lock these in now and have [CC-2] do the forms accordingly."

e.    CQC ultimately sent the manipulated ByNew data to Issuer-1 when claiming VCUs for the Malawi and Zambia Projects. CQC also submitted those manipulated values to Issuer-1 in four other monitoring periods for those projects. In all, CQC received approximately 2.6 million more VCUs for the Malawi and Zambia Projects than it would have had it reported the correct ByNew data to Issuer-1.

32.    KENNETH NEWCOMBE and TRIDIP GOSAMI, the defendants, and Jason Steele took steps to hide their scheme to manipulate ByNew data, including from the SPV partner involved in one of the Zambia Projects:

a.    In or about May 2022, NEWCOMBE, GOSWAMI, and Steele learned that a member of CSAT ("Employee-2") had given one of CQC's SPV partners—an international bank ("Bank-1")—data about one of the Zambia Projects for which they had manipulated ByNew surveys. This was in violation of a CQC policy, put in place by NEWCOMBE, that prohibited CSAT members from communicating with investors.

b.    NEWCOMBE and GOSWAMI exchanged text messages, expressing concern about the possibility that Employee-2 had told Bank-1 that CQC did not conduct surveys properly. For example, GOSWAMI sent NEWCOMBE a message, apologizing for what Employee-2 had done and explaining that he was trying to figure out what Employee-2 had shared

with Bank-1.  Newcombe responded:

> Yes these are critical questions.  Especially what [Employee-2] has
> told [Bank-1] and if there was an answer to [Bank-1's] e-mail by
> [Employee-2] in which [Employee-2] claims that we don't do these
> surveys properly.  That seems to me to be the smoking gun.  I need
> to know [I have] full honesty and disclosure from [Employee-2]
> whether he had actual calls one on one with [Bank-1] that may have
> been recorded as I have to believe [Bank-1] would do that.  And we
> need to get all e-mail exchanges between [Bank-1] and [Employee-
> 2].  Without that I could find myself defending a position that they
> could prove is incorrect and digger [sic] an ever bigger hole for
> myself and us.

     c.     Over the next two weeks, NEWCOMBE, GOSWAMI, and Steele continued to assess what information Bank-1 had received.  Steele summarized the problem in an email to NEWCOMBE, explaining that they did not know what Bank-1 had received "related to the MP1 survey data analysis sheet" for the Zambia Project.  Steele noted that, if they could confirm Bank-1 did not receive anything, "then we are fine," but "[i]f they did . . . we may be in trouble."  Steele then referred to a message GOSWAMI had sent NEWCOMBE and Steele, in which GOSWAMI had explained that if Employee-2 shared the "original or managed" MP1 data with Bank-1, "then we are doomed."

     d.     Ultimately, Bank-1 did not uncover the fraud, and NEWCOMBE, GOSWAMI, and Steele continued to use manipulated data when CQC applied for, and obtained, VCUs.

     33.     Another instance of the ByNew data manipulation involved a project in Angola that CQC was operating as part of its SPVs:

     a.     In the summer of 2022, CQC began receiving ByNew survey results for MP1 of a project in Angola (the "Angola Project").  KENNETH NEWCOMBE, the defendant, wrote an email to an employee involved in the survey ("Employee-1"), copying TRIDIP

GOSWAMI, the defendant, and Jason Steele. He noted that the ByNew survey results were "nowhere near as favorable for carbon credit generation" as he had anticipated based on a prior study and asked Employee-1 about possible reasons for the problem. Steele then dropped Employee-1 from the email chain and asked NEWCOMBE how many VCUs CQC needed to make the Angola Project work, to which NEWCOMBE responded that they needed an outcome of 8.5 VCUs per household. Steele asked NEWCOMBE if they could "live with" an average of 8 VCUs per household, and NEWCOMBE agreed to that number.

  b.  NEWCOMBE, GOSWAMI, and Steele conspired to manipulate the ByNew data to get the number of VCUs the Angola Project would generate closer to NEWCOMBE's target. Steele calculated the ByNew value CQC would need to achieve the VCU target, and wrote a text message to GOSWAMI that the numbers would "need to come up to 3.54 [kg]." Steele kept NEWCOMBE in the loop, sending him a text message that CSAT was working on the ByNew data for the Angola Project and remarking "[b]ack end management if you know what I mean." NEWCOMBE, GOSWAMI, and Steele used the word "manage" to refer to manipulating data, so "back end management" was a reference to the CSAT team manipulating the data.

  c.  Consistent with Steele's request to GOSWAMI, CQC reported a ByNew value of 3.54 kg to Issuer-1 in connection with obtaining VCUs for MP1 of the Angola Project. CQC also applied for, and obtained, VCUs from the Angola Project in a second monitoring period, during which it again used the manipulated data. In all, CQC obtained over 10,000 more VCUs for the Angola project than it would have, absent the fraud.

  34.  The scheme to manipulate ByNew data to obtain VCUs from Issuer-1 extended beyond the Malawi, Zambia, and Angola Projects. At the direction of members of the conspiracy—including KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, and

Jason Steele—CQC also submitted manipulated ByNew data to Issuer-1 for projects in Zimbabwe, Thailand, Cambodia, and Vietnam, among other places.

Manipulating the Number of Operational Stoves

35. KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, Jason Steele, and others at CQC also fraudulently obtained VCUs from Issuer-1 by providing false and misleading information about the number of operational stoves in CQC's projects.

36. As explained above, the Cookstove Methodology was designed to ensure that project developers would receive VCUs only for stoves that had been operational during a monitoring period. If the stove was not working or in use, it could not have reduced emissions, and so should not be used for claiming VCUs.

37. KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, and Jason Steele knew that, because of CQC's rapid growth, CQC was having problems installing stoves properly, installing stoves in correct locations, and visiting households to ensure that stoves remained in working order. Nonetheless, rather than writing off and not claiming credits for stoves that were missing, broken, or not installed in correct locations, NEWCOMBE, GOSWAMI, and Steele conspired to conceal from Issuer-1 the true extent of problems with CQC's Cookstove Projects.

38. KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, and Jason Steele concealed the truth from Issuer-1, in part, by manipulating the P value surveys. Under the Cookstove Methodology, P value surveys were supposed to establish the percentage of stoves that were operational and in use. The co-conspirators manipulated these surveys, so CQC could claim a higher percentage of stoves were operational than was actually the case, inflating the number of VCUs CQC would obtain. Because of this manipulative scheme, CQC regularly reported to

15

Issuer-1 that the P value was equal, or close, to 1.00, meaning that 100% of the stoves CQC had installed were operational, even though that was not the case.

39.    One way KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, and Jason Steele manipulated P value surveys was through oversampling.  To calculate the P value under the Cookstove Methodology, CQC was supposed to identify a random sample of households that had received new stoves, then visit the homes to determine whether the stoves were operational and in use.  The Cookstove Methodology allowed project developers to identify additional stoves for sampling, to be used if people conducting the surveys could not visit one of the houses in the random sample.  This was sometimes called a "buffer" sample.  For instance, if a project needed a sample of 50 households to generate a statistically significant sample result, the Cookstove Methodology allowed CQC to identify some additional households—say, for example, ten—that surveyors could visit if some of the people in the original sample were not home or could not be reached.

40.    KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, and Jason Steele conspired to manipulate the P value surveys by having CQC's surveyors misuse the buffer sample to cover up finding missing or broken stoves in the original sample.  If a surveyor visited a household in the original sample and found a broken stove, that household was supposed to count as non-operational for the P value survey.  Instead, surveyors for CQC would use the households in the buffer sample to find operational stoves that would make up for households that were missing stoves in the original sample.  This practice was explicit in CQC's non-public training manual, which stated: "Additional households should be surveyed in order to compensate/cover up for households where any one or both project stoves were not found operational (equal

16

number)."

41.    The effect of this manipulative oversampling was to fraudulently inflate the P value for CQC's Cookstove Projects.  For example, suppose a project had a random sample of 50 households and surveyors found 40 operational stoves and five broken stoves.  That should result in a P value of 0.8, or 80% of stoves in operation.  Instead, because of the manipulative practice instituted by the co-conspirators, CQC would use households with operational stoves from the buffer sample to replace households with broken stoves in the original sample.  This would inflate the P value above 80%, resulting in CQC receiving additional VCUs.  CQC's practice of oversampling, which was not allowed under the Cookstove Methodology, was concealed from Issuer-1 and CQC provided misleading P values to Issuer-1.

42.    KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, and Jason Steele also manipulated P value surveys by instituting a practice of having CQC employees rebuild or fix stoves in samples that were missing or broken, then reporting those stoves as operational. Under the Cookstove Methodology, if a project developer found that one of the households in a random sample had a broken or missing stove, the developer was not supposed to report the stove as operational on the P value survey.  The stove had not been working, so it could not have been reducing emissions.  Instead, NEWCOMBE, GOSWAMI, and Steele conspired to have employees rebuild or repair stoves in households that were part of the survey, then report the stoves as operational.

43.    For example, in a September 2021 WhatsApp chat between an operations manager at CQC ("Employee-3") and Jason Steele, Employee-3 reported that during an inspection of a house in which they had previously installed a stove, they discovered that "[t]he house is no longer there[.] [T]he beneficiary lived in a makeshift structure."  Steele responded, "Hmm, instead of

losing all the carbon as a result of getting 19 out of 20 samples, can we . . . build a stove in a nearby house, and say the person moved but gave the stove parts . . . to another household . . . . Just spit balling here. I know you love this stuff." Employee-3 responded, "I hate it. But understand the implications."

44.    Similarly, in a June 2022 text message, Jason Steele wrote to KENNETH NEWCOMBE, the defendant, that many of the stoves in the sample for one of the Zambia Projects were built by a partner who was a poor installer, "so stoves need to be rebuilt in the monitoring process."

45.    This fraudulent practice of claiming VCUs for broken and missing stoves increased over time. CQC's rapid growth caused significant problems for the quality of the Cookstove Projects. As project sizes and volume became more unmanageable, degradation in quality and training swelled. Absent manipulation, those conditions had the potential to adversely affect P value. If stoves were not in operation—either because they were inoperable, or the beneficiary did not know how to use them properly—the stoves could not be counted being as in-use. The teams responsible for installing stoves and conducting surveys therefore intensified efforts to repair and replace broken stoves, in order to inflate P values.

46.    KENNETH NEWCOMBE, the defendant, was aware of and approved this type of manipulation. For example, operations staff routinely communicated these quality control issues to NEWCOMBE on weekly operations calls. They also updated NEWCOMBE, with his approval, on their efforts to rebuild and replace stoves.

47.    Through these practices, which were not allowed under the Cookstove Methodology, KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, Jason Steele, and others fraudulently inflated the Cookstove Projects' P values and thus the number of stoves

for which CQC could claim emission reductions. Notwithstanding those efforts, NEWCOMBE repeatedly certified to Issuer-1 that the inflated P value surveys were "true and accurate in all material respects and do not contain any false, fraudulent or misleading statements or information." These certifications, which CQC submitted to Issuer-1 from New York, New York, were false and misleading.

## The Scheme to Defraud Investor-1

48. Relying on CQC's supposedly successful growth and its growing VCU pipeline, KENNETH NEWCOMBE, the defendant, and others at CQC deceived Investor-1 into agreeing to invest up to \$250 million in CQC. As part of the investment, NEWCOMBE personally received over \$16 million from Investor-1.

49. Investor-1 is an investment firm that invests in assets in the energy, transportation, and agriculture sectors. In particular, Investor-1 focuses on projects designed to fight climate change. Investor-1 first considered an investment in CQC in or about 2020 but declined the opportunity because of CQC's unstable cash flows at the time.

50. A potential investment in CQC came into focus again for Investor-1 in or about 2022. A banker pitching the opportunity explained that CQC's prospects were then materially better because it was installing large numbers of cookstoves, was generating VCUs, and had forward agreements with a number of companies—including SPV partners—that guaranteed there would be purchasers for those VCUs at fixed prices. Interested in the potential investment opportunity, Investor-1 solicited more information about CQC.

51. In September 2022, Investor-1 received an investment memo about CQC signed by KENNETH NEWCOMBE, the defendant. The memo gave an overview of CQC's operations, emphasizing the success of CQC's SPV projects in Africa and providing projections about VCUs

19

and revenue the company expected to receive from those projects. The memo was followed by a meeting with Investor-1, NEWCOMBE, and others, during which NEWCOMBE gave a detailed description of CQC's operations and the relevant VCU methodologies.

52. The investment memo and presentation by KENNETH NEWCOMBE, the defendant, convinced Investor-1 that an investment in CQC was worth exploring further, and an extensive diligence process followed. For Investor-1, a critical part of that process was understanding the VCUs and revenue that CQC expected to receive from installed stoves in its existing SPV projects. Having been previously concerned about CQC's cashflows, Investor-1 wanted to be certain that there were sufficient revenue streams to make the investment profitable. To that end, CQC sent Investor-1 data on its existing SPVs and cash flows. This included data about VCUs and revenue from the projects in which NEWCOMBE, TRIDIP GOSWAMI, the defendant, and Jason Steele had committed fraud. As part of the diligence process, CQC also sent Investor-1 several forward contracts that it had signed, locking buyers into purchasing VCUs at fixed prices in the future. These contracts, which showed there was a market for the VCU's that CQC's projects were generating, were important in giving Investor-1 comfort about CQC's cashflows.

53. Investor-1 also conducted numerous interviews of CQC employees, including Jason Steele. During that interview, Steele explained the Cookstove Methodology in detail, using one of the Malawi Projects as an example of how CQC obtained VCUs. Steele did not disclose to Investor-1 that CQC did not properly follow the Cookstove Methodology, including for the Malawi Projects, and instead sent Issuer-1 manipulated, false, and misleading data.

54. KENNETH NEWCOMBE, the defendant, communicated regularly with representatives of Investor-1 during the diligence process, during which NEWCOMBE gave

detailed information about the Cookstove Projects and emphasized the quality and integrity of those projects. NEWCOMBE did not disclose to Investor-1 the fraudulent practices it used to claim VCUs, including through manipulating ByNew data and P value surveys. To the contrary, NEWCOMBE routinely boasted about how well CQC was managing its growth, and portrayed CQC as a company of high integrity and professionalism.

55.     Based on the false statements and material omissions of KENNETH NEWCOME, the defendant, and his co-conspirators, Investor-1 ultimately agreed to commit $250 million to CQC. Investor-1 sent $100 million at signing, with additional funds callable by CQC in the future. Investor-1 ultimately sent CQC $150 million. As part of the deal, Investor-1 also bought shares from CQC's existing shareholders. This included buying a portion of NEWCOMBE's shares for over $16 million.

<u>Statutory Allegations</u>

56.     From at least in or about 2021 through at least in or about 2023, in the Southern District of New York and elsewhere, KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

57.     It was a part and an object of the conspiracy that KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing

such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, NEWCOMBE and GOSWAMI agreed to send and caused to be sent false and misleading information to Issuer-1 for the purpose of causing Issuer-1 to issue voluntary carbon units to CQC, which CQC then sold or planned to sell, including through the sending and receiving of emails and other electronic communications.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

58. The allegations contained in paragraphs 1 through 55 of this Indictment are repeated and realleged as if fully set forth herein.

59. From at least in or about 2021 through at least in or about 2023, in the Southern District of New York and elsewhere, KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, NEWCOMBE and GOSWAMI engaged in a scheme to send false and misleading information to Issuer-1 for the purpose of causing Issuer-1 to issue voluntary carbon units to CQC, which CQC then sold or planned to sell, including through the sending and receiving of emails and other electronic communications.

(Title 18, United States Code, Sections 1343 and 2.)

22

## COUNT THREE
### (Conspiracy to Commit Commodities Fraud)

The Grand Jury further charges:

60.     The allegations contained in paragraphs 1 through 55 of this Indictment are repeated and realleged as if fully set forth herein.

61.     From at least in or about 2021 through at least in or about 2023, in the Southern District of New York and elsewhere, KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1.

62.     It was a part and object of the conspiracy that KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, and others known and unknown, willfully and knowingly, would and did, directly and indirectly, use and employ, and attempt to use and employ, in connection with a swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (2) making, and attempting to make, an untrue and misleading statement of a material fact and omitting to state a material fact necessary in order to make the statements made not untrue and misleading; and (3) engaging, and attempting to engage in an act, practice, and course of business which operates and would operate as a fraud and deceit upon a person, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), to wit, NEWCOMBE and GOSWAMI agreed with others to send false and misleading information to Issuer-1, for the purpose of causing

23

Issuer-1 to issue voluntary carbon units to CQC, which CQC sold or planned to sell.

### Overt Acts

63.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.      In or about 2021, KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, caused CQC employees to submit to Issuer-1 manipulated data about CQC projects in Malawi.

b.      In or about 2021, KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, caused CQC employees to submit to Issuer-1 manipulated data about CQC projects in Zambia.

(Title 18, United States Code, Section 371.)

### COUNT FOUR
### (Commodities Fraud)

The Grand Jury further charges:

64.     The allegations contained in paragraphs 1 through 55 of this Indictment are repeated and realleged as if fully set forth herein.

65.     From at least in or about 2021 through at least in or about 2023, in the Southern District of New York and elsewhere, KENNETH NEWCOMBE and TRIDIP GOSWAMI, the defendants, willfully and knowingly, directly and indirectly, used and employed, and attempted to use and employ, in connection with a swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing, and attempting to use and employ, a manipulative

device, scheme, and artifice to defraud; (2) making, and attempting to make, an untrue and misleading statement of a material fact and omitting to state a material fact necessary in order to make the statements made not untrue and misleading; and (3) engaging, and attempting to engage in an act, practice, and course of business which operates and would operate as a fraud and deceit upon a person, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), to wit, NEWCOMBE and GOSWAMI engaged in a scheme to send false and misleading information to Issuer-1, for the purpose of causing Issuer-1 to issue voluntary carbon units to CQC, which CQC sold or planned to sell.

(Title 7, United States Code, Sections 9(1) and 13(a)(5); Title 17, Code of Federal Regulations, Section 180.1)

## COUNT FIVE
### (Conspiracy to Commit Securities Fraud)

The Grand Jury further charges:

66.    The allegations contained in paragraphs 1 through 55 of this Indictment are repeated and realleged as if fully set forth herein.

67.    From at least in or about 2022 through at least in or about 2023, in the Southern District of New York and elsewhere, KENNETH NEWCOMBE, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

68.    It was a part and an object of the conspiracy that KENNETH NEWCOMBE, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of a means and an instrumentality of interstate commerce and of the mails, and of a facility of

a national securities exchange, would and did use and employ, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operates and would operate as a fraud and deceit upon a person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, to wit, NEWCOMBE agreed with one or more others to engage in a scheme to induce Investor-1 to purchase an interest in CQC by providing Investor-1 false and misleading information regarding CQC's operations and the carbon credits that CQC had obtained.

## Overt Act

69.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere: in or about late 2022, KENNETH NEWCOMBE, the defendant, sent Investor-1, data about the amount of voluntary carbon units CQC had received, and expected to receive, from existing CQC projects.

(Title 18, United States Code, Section 371.)

## COUNT SIX
### (Securities Fraud)

The Grand Jury further charges:

70.    The allegations contained in paragraphs 1 through 55 of this Indictment are repeated and realleged as if fully set forth herein.

71.    From at least in or about 2022 through at least in or about 2023, in the Southern

District of New York and elsewhere, KENNETH NEWCOMBE, the defendant, willfully and knowingly, directly and indirectly, by use of a means and an instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operates and would operate as a fraud and deceit upon a person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, to wit, NEWCOMBE engaged in a scheme to induce Investor-1 to purchase an interest in CQC by providing Investor-1 false and misleading information regarding CQC's operations and the carbon credits that CQC had obtained

## FORFEITURE ALLEGATION

72.     As a result of committing one or more of the offenses charged in Counts One, Two, Three, Five and Six of this Indictment, KENNETH NEWCOMBE, the defendant, and for the offenses charged in Counts One through Three of this Indictment, TRIDIP GOSWAMI, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but

not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendants personally obtained.

Substitute Assets

73.    If any of the above-described forfeitable property, as a result of any act or omission by the defendants:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided without

difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981(a)(C);<br/>Title 21, United States Code, Section 853(p);<br/>Title 28, United States Code, Section 2461.)

Damian Williams

FOREPERSON

DAMIAN WILLIAMS
United States Attorney